UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE RETAILMENOT BROWSER EXTENSION LITIGATION | Case No. 1:25-cv-00783 (JLR) |
| | **<u>OPINION AND ORDER</u>** |

JENNIFER L. ROCHON, United States District Judge:

This case is about links.  Plaintiffs — social media and other online content creators — earn commissions when their followers buy products from merchants after following Plaintiffs' affiliate links to the merchants' sites.  Plaintiffs allege that a browser extension created by Defendants RetailMeNot, Inc. ("RetailMeNot") and Ziff Davis, Inc. ("Ziff Davis" and, together with RetailMeNot, "Defendants") surreptitiously intervenes in that process and redirects their commissions to Defendants.  The matter is before the Court on Defendants' motion to dismiss, which, for the following reasons, the Court GRANTS in part and DENIES in part.

## BACKGROUND

### I.    Relevant Facts

The following facts are taken from the Consolidated Complaint, *see* Dkt. 34 ("Compl.") and are presumed true for purposes of this motion.  Plaintiffs — Just Josh, Inc. ("Just Josh"); Motion Butter, LLC ("Motion Butter"); Richard Young ("Young"); TechSource Official ("TechSource"); ToastyBros, LLC ("ToastyBros"); and Brevard Marketing, LLC ("Brevard") — are content creators with channels on YouTube, among other platforms.  *See* Compl. ¶¶ 2, 106, 113, 120, 127, 135, 142.  Each Plaintiff partners with certain merchants to promote those merchants' products, and in return Plaintiffs receive commissions for sales they influence.  *Id.* ¶¶ 109-11, 116-18, 123-25, 131-33, 138-40, 145-47.  This process, known as affiliate marketing, is "a multi-billion-dollar industry."  *Id.* ¶ 30.

Whether a sale has been influenced by a particular content creator is tracked through affiliate links and corresponding tracking codes. *Id.* ¶¶ 33-34. Thus, for example, a content creator will post a video on YouTube reviewing or otherwise promoting a product and will "include the affiliate link with their content." *Id.* ¶ 35. Whoever clicks that link is taken to the merchant's website, where they can buy the promoted product. *Id.* A click on that link also creates and stores "a small text file" (a cookie) "on the consumer's web browser that includes information identifying the creator," and that cookie "tracks the consumer's activity on the online merchant's website to determine whether the consumer ultimately purchases a product or service." *Id.* ¶¶ 45-46. When a consumer purchases the merchant's product after arriving at the site through an affiliate link, the content creator who provided the link — and whose affiliate tracking code is implanted in the cookie — receives a commission from the merchant on that sale. *Id.* ¶ 35; *see also id.* ¶ 34 ("Online merchants use affiliate tracking codes — like cookies, tracking tags, or server-side functions — to determine whether a consumer landed on the webpage . . . and made a purchase after having clicked on an affiliate link.").

More specifically, the content creator receives a commission when the consumer clicks their affiliate link, and no other affiliate link thereafter, to reach the merchant's website and then purchases the product; this is known as the "last-click attribution model." *Id.* ¶ 48. Thus, for example, if a consumer watched a video by Plaintiff Just Josh and followed his affiliate link to the merchant's site, then watched a video about the same product by Plaintiff Motion Butter and followed *their* affiliate link to the same site and purchased the product in that new window, Motion Butter would be entitled to the commission on that sale. *Id.* ¶¶ 49-50. "In other words, 'last click' refers to the last link clicked that directed the consumer to the merchant's website." *Id.* ¶ 50. Plaintiffs have all contracted with various merchants to perform affiliate marketing for them, in exchange for such commissions, consistent with this last-click attribution model. *Id.*

¶ 53.  Thus, "[p]ursuant to those contracts, Plaintiffs . . . are entitled to commissions on converted sales when the consumer's final *external* click before reaching a merchant's website was a click on the creator's affiliate link."  *Id.*

RetailMeNot partners with many of those same merchants.  *Id.* ¶ 53; *see also id.* ¶ 29.  It is the creator of a free browser extension that "promis[es] to test and apply available discount, promotional, and coupon codes to items already in customers' online shopping carts."  *Id.* ¶ 25; *see also id.* ¶ 19.  The browser extension does not apply these codes automatically: consumers must "actively engage with the browser extension — i.e., click buttons — to search for discounts or rewards."  *Id.* ¶ 76.  Plaintiffs allege that, when a consumer clicks one of their affiliate links but then engages with the RetailMeNot extension in this way before finalizing their purchase, the extension "simulate[s] a 'last click'" for attribution purposes that supersedes the click on Plaintiffs' affiliate links.  *Id.* ¶ 76; *see also id.* ¶¶ 77-78, 81-82.  The extension does so by opening a "hidden mini-tab" on the browser and "inject[ing] a 'redirect' URL into [it], which forces a refresh of the merchant page, mimicking a new click by the consumer from an external RetailMeNot affiliate link back onto the merchant's checkout page."  *Id.* ¶ 77.  This occurs upon the consumer's engagement with the extension even if RetailMeNot cannot ultimately find a coupon or discount to apply to the sale.  *Id.* ¶ 96 at Image 25 & 26.  Moreover, because RetailMeNot's browser extension "runs in the background on every webpage visited by the consumer," *id.* ¶ 28, and "comprehensively monitors browsing history URLs" containing "other affiliate tracking codes" and "its own overwritten affiliate codes," Defendants "know[] or should know that the sale in question originated from a creator's affiliate link, not a RetailMeNot affiliate link," *id.* ¶¶ 69-70.

By this "sleight of hand," *id.* ¶ 79, RetailMeNot receives a commission on the sale, even though Plaintiffs' efforts (and affiliate link) originally led the consumer to the merchant's site.

3

*Id.* ¶¶ 81-82.  Plaintiffs allege that the consumers themselves are "unaware of the fact" that prompting the RetailMeNot extension to search for discounts will "overwrit[e] a creator's affiliate code and replac[e] it with a RetailMeNot affiliate code," *id.* ¶ 100, and they contend that this overwriting constitutes a fraudulent practice known as "cookie stuffing," *id.* ¶ 97.

To demonstrate that RetailMeNot's extension supersedes their affiliate links in this way, Plaintiffs point to a test sale made through one of Young's affiliate links.  *Id.* ¶¶ 83-88.  When the test consumer used Young's affiliate link and finalized the purchase without engaging with the RetailMeNot extension to search for discounts, Young received a commission from the sale; when the consumer used Young's affiliate link and engaged with the extension just before purchase, however, Young did not receive a commission.  *Id.*  Plaintiffs also present statistical analysis they conducted "to calculate the likelihood that, given a legitimate affiliate purchase, RetailMeNot stole the creator's commission."  *Id.* ¶ 103.  The variables that this analysis "took into consideration" included the prevalence of the RetailMeNot browser extension.  *Id.* According to the analysis, "there is a 92.4% likelihood" that RetailMeNot "stole[]" "at least one (and as many as six)" commissions from content creators who generate "as few as 1,000" commission-eligible transactions.  *Id.* ¶ 104.  Multiple Plaintiffs allege that their affiliate marketing efforts generate transactions well above that number.  *See id.* ¶ 118 (Plaintiff TechSource: "roughly 50,000 transactions over the past year"); *id.* ¶ 125 (Plaintiff ToastyBros: "approximately 93,000 transactions" annually); *id.* ¶ 140 (Plaintiff Motion Butter: "over 10,000 transactions . . . over the past five years"); *id.* ¶ 147 (Plaintiff Brevard Marketing: "approximately 150,000 transactions" annually).  Plaintiffs further allege that they all earn a certain amount annually from these efforts, some in the hundreds of thousands of dollars, and "would have earned more in commissions but for Defendants' scheme to poach" their commissions.  *Id.* ¶¶ 111-12, 118-19, 125-26, 133-34, 140-41, 147-48.

## II.    Procedural History

This matter began as four separate lawsuits against Defendants.  The first was filed on January 28, 2025, and all were consolidated into the instant action by the parties' stipulation on March 21, 2025.  *See generally* Dkt. 29.  That stipulation included that Plaintiffs would, following consolidation, file a Consolidated Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 42(a).  *Id.* at 2-3.  Plaintiffs filed that complaint on May 30, 2025.  *See generally* Compl.  Defendants moved to dismiss that complaint on July 25, 2025, for lack of standing and failure to state a claim.  *See* Dkt. 43; Dkt. 44 ("Br.").  The motion is fully briefed. *See* Dkt. 51 ("Opp."); Dkt. 56 ("Reply").

## LEGAL STANDARD

"A 'case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'" *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Constitutional "[s]tanding doctrine operates 'to ensure that federal courts do not exceed [that power] as it has been traditionally understood.'" *Fac., Alumni, and Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 74-75 (2d Cir. 2021) (quoting *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020)).  Under Article III of the Constitution, plaintiffs have standing to bring a suit where they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (quoting *Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  "Standing is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117 (2d Cir. 2022).  "[A]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice'" to establish the individual elements of

5

Article III standing.  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Additionally, under Rule 12(b)(6), a "complaint may be dismissed to the extent that it 'fail[s] to state a claim on which relief can be granted.'"  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110 (2d Cir. 2010) (alteration in original) (quoting Fed. R. Civ. P. 12(b)(6)).  On a motion seeking such dismissal, the Court "accept[s] the material facts alleged in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 162 (2d Cir. 2025) (quoting *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 140 (2d Cir. 2023)).  However, the Court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Moreover, at this posture, "[a] complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

## DISCUSSION

### I.    Standing

Defendants first move to dismiss under Rule 12(b)(1), arguing that Plaintiffs have failed to establish an injury in fact that is traceable to Defendants and, thus, lack Article III standing. *See* Br. at 9-15.  Specifically, Defendants argue that Plaintiff's test purchases and statistical analysis do not establish a concrete injury, *id.* at 10-13, and that any number of intervening

causes may have driven Plaintiffs' loss of commissions, *id.* at 13-15.  The Court is not convinced.

>### A.      Injury in Fact

"An injury in fact must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Silva*, 47 F.4th at 86 (quoting *Lujan*, 504 U.S. at 560).  An injury is concrete when it is "real and not abstract"; it is particularized when it "affect[s] the plaintiff in a personal and individual way," and is not "a generalized grievance"; and it is actual or imminent when it has "already occurred or [is] likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  "[A] monetary injury" that satisfies these conditions is an injury in fact. *Id.*  According to Defendants, Plaintiffs have not pleaded such an injury for two reasons: first, because they "cannot point to a *single* sale for which they should have earned a commission but did not" and, second, because their statistical analysis reflects only "a 'probability' of harm." Br. at 9.  Both arguments misconstrue the pleadings.

First, Plaintiffs do point to a sale for which they should have earned a commission but did not: the test purchases.  *See* Compl. ¶¶ 83-88.  These are not "simulated 'last clicks,'" Br. at 9, or "hypothetical interactions" with the RetailMeNot browser extension, Br. at 10, but rather real purchases made by Plaintiffs' experts, one of which deprived Plaintiff Young of his commission and the other of which did not. *See* Compl. ¶¶ 83-88.  *Cf. FEC v. Cruz*, 596 U.S. 289, 297 (2022) (holding that injuries sufficiently established standing "even if [they] could be described in some sense as willingly incurred," because the fact that plaintiffs "chose to subject themselves to [legal] provisions [causing the injury] does not change the fact that they *are* subject to them"). Defendants argue that the browser extension prompts consumers to make a genuine "last click" before their purchase, and that it therefore "reflects permissible competition, not injury." Br. at 10.  But that is "a merits issue, which [the Court] need not decide in analyzing whether

[Plaintiffs] ha[ve] standing to sue." *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 95 n.10 (2d Cir. 2017) (finding that plaintiff adequately pleaded injury-in-fact by alleging that state regulators charged bidding fees in violation of federal law, over defendants' argument that such fees were not such a violation). *See also Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018) (finding that plaintiff adequately pleaded injury-in-fact by alleging it had paid insurance premiums for void or voidable policies, over defendants' argument that insurers were required to honor the policies regardless of their legality).[1]

Second, the purpose of Plaintiffs' statistical analysis is not to establish probability of harm in the absence of a pleaded concrete injury, but rather to demonstrate that the injury Plaintiff Young experienced during the test purchases is not an anomaly. *Whole Foods* — which Plaintiffs cite, *see* Opp. at 8 — is instructive on this point. In that case, the plaintiff alleged that he "routinely shopped" at a grocery store over a one-year period and, during that shopping, bought "pre-packaged cheese and cupcakes approximately one or two times per month." *Whole Foods*, 858 F.3d at 734. He further alleged that the grocer priced pre-packaged items based on their weight, but "routinely inflated" that weight and thus "overcharged unwitting customers." *Id.* The plaintiff did not plead "a specific food purchase as to which [the store] overcharged [him]." *Id.* But he attached to his complaint a press release from a governmental consumer affairs department announcing that the department had investigated the grocer — during the same period that the plaintiff shopped there, and at the same locations the plaintiff frequented — and had made preliminary findings that the grocer routinely overcharged

---

[1] Defendants additionally argue that Plaintiffs' test purchases cannot demonstrate injury because "'[t]ester' standing is typically confined to discrimination cases," Reply at 5, but they cite no cases restricting tester standing in that way. *Cf. In re Cap. One Fin. Corp.*, No. 25-cv-00023, 2025 WL 1570973, at *5 n.13 (E.D. Va. June 2, 2025) (rejecting similar argument and noting that "neither the Supreme Court nor the Fourth Circuit has limited tester standing principles to the civil rights context exclusively").

customers in the way the plaintiff alleged. *Id.* at 734-35. Indeed, 89 percent of the pre-packaged foods were determined to have been mis-weighed. *Id.* at 735. Accepting the plaintiff's allegations and the press release's report of the investigatory findings as true, the Second Circuit held that "it [was] plausible that [the plaintiff] overpaid for at least one product," and therefore the plaintiff had sufficiently pleaded an injury in fact. *Id.* at 737-38.

Here, Plaintiffs present statistics and test-purchase evidence for a similar purpose: the test purchase demonstrates monetary injury to Plaintiff Young, and the statistics plausibly suggest that he and the other Plaintiffs have faced the same injury any time the RetailMeNot browser extension interceded in a purchase made by a consumer who originally clicked Plaintiffs' affiliate links. In other words, the accompanying statistical analysis aids the Court in extrapolating the existence of a broader injury in fact; it does not stand in place of a concrete injury, which here was evidenced by the actual test purchases. *Compare Cap. One*, 2025 WL 1570973, at *5 (finding injury in fact adequately pleaded in similar case, based on "Expert Test Purchases . . . bolstered by statistical evidence of a near certain likelihood of harm for each Plaintiff because of [defendant's browser] extension"), *with Wendover Prods., LLC v. Paypal Inc.*, No. 24-cv-09470, 2025 WL 3251667, at *3 (N.D. Cal. Nov. 21, 2025) (finding injury in fact insufficiently pleaded in similar case, but where plaintiffs did not plead test purchases showing both received and withheld commissions).

Defendants cite multiple cases in which, they say, the Supreme Court and Second Circuit have disfavored the use of "statistical analysis" to prove injury for standing purposes. *See* Br. at 11. None of those cases forecloses Plaintiffs' approach, though, because none of those plaintiffs used statistical analysis in the way Plaintiffs do here — none, indeed, used statistical analysis at all. For example, in *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022), the defendants had previously "faced criminal and regulatory enforcement actions

9

that resulted in . . . penalties and fines" for manipulating the prices of certain commodities. *Id.* at 75-76. The plaintiff, relying on information gathered in those prior actions, alleged that defendants had engaged in the same manipulation on "nine separate dates on which at least one plaintiff" was also trading the affected commodity. *Id.* at 76. From this, plaintiff simply "inferred" that it had been injured. *Id.* at 77. The Second Circuit disagreed, noting that the plaintiff had only "conclusorily [alleged] that there must have been at least one trade — though it has no idea which one or when it may have occurred — in which it came out on the net losing end of [d]efendants' market manipulation." *Id.* at 78.

Defendants' other cases likewise involve the plaintiffs' mere conjecture — sometimes described as relying on "probability" or "statistical likelihood," but never actually involving statistics akin to that presented here or in *Whole Foods* — that, within the general miasma of the defendant's wrongdoing, they probably were or would be injured. Those are inapposite for the same reasons as *Gamma Traders*. *See Doe v. Hochul*, 139 F.4th 165, 181-82 (2d Cir. 2025) (holding that "statistics or probabilities" suggesting "that there are viable fetuses in New York who may soon be threatened by abortion or other fetal harm" were insufficient to establish standing of plaintiff who "generally asserts claims on behalf of *all* viable fetuses in the state of New York who *may* be at risk of harm due to [New York law]'s elimination of criminal penalties for abortion and fetal homicide"); *Fac., Alumni, and Students Opposed to Racial Preferences*, 11 F.4th at 76-77 (holding that organizational plaintiff lacked standing to sue for discrimination in faculty hiring and article selection where it alleged only that its unidentified members "intended" to apply for positions and submit articles, and noting that such intent does not create "a statistical probability that some of those members are threatened with concrete injury"); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-98 (2009) (rejecting notion that, because organization "has more than 700,000 members nationwide, it is probable that some (unidentified) members have planned

to visit some (unidentified) small parcels affected by the [defendant]'s procedures and will suffer (unidentified) concrete harm as a result" (citation modified)); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 489 (1982) (rejecting plaintiffs' argument that violations of Establishment Clause "typically will not cause injury sufficient to confer standing" and therefore plaintiffs should be excused from pleading injury, and explaining that "we are unwilling to assume that injured parties are nonexistent simply because they have not joined respondents in their suit.  The law of averages is not a substitute for standing").

Defendants also take issue with the methodology of Plaintiffs' statistical model, arguing, for example, that Plaintiffs have failed to plead "what algorithm was used, what values were assigned to each variable, [and] whether the algorithm is an accepted method," concluding that "[t]hese omissions prevent the Court from verifying the statistical analysis."  Br. at 12.  But "verifying" is not part of the Court's inquiry at the pleading stage.  Plaintiffs may well "ultimately be unable to show [they were] injured under the more demanding standards applicable at summary judgment or trial," but the question presently is whether they have crossed "the 'low threshold' required to plead injury in fact."  *Whole Foods*, 858 F.3d at 737-38 (quoting *WC Cap. Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013)).  The Court finds that they have.  Therefore, Plaintiffs have adequately pleaded injury in fact for purposes of Article III standing.

### B.    Fairly Traceable

An injury is "fairly traceable" if there is "a causal nexus between the defendant's conduct and the injury."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).  This nexus is "a lower standard than proximate cause," and a plaintiff's burden to establish it at the pleading stage is "relatively modest."

11

*Rothstein*, 708 F.3d at 92 (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)); *accord Leslie v. City of New York*, No. 22-cv-02305 (NRB), 2023 WL 2612688, at *5 (S.D.N.Y. Mar. 23, 2023).

Defendants contend that Plaintiffs have not pleaded a traceable injury because their lower-than-expected commissions may be the result of other factors, such as "declined consumer sentiment . . . or lower conversions from Plaintiffs' content." Br. at 13; *see also* Reply at 6. That argument ignores entirely the test purchases, through which Plaintiffs plead a direct connection between the loss of their commission and the consumer's use of the RetailMeNot browser extension. *See* Compl. ¶¶ 83-88. That pleading does not require "speculative inferences and assumptions" to allege traceability. Br. at 14 (quoting *Davis v. Garcia*, No. 07-cv-09897 (CLB), 2008 WL 2229811, at *5 (S.D.N.Y. May 27, 2008)). As discussed above, Plaintiffs further plead through statistical analysis that these test purchases are not the only instance in which they were injured in this way. *Id.* ¶¶ 101-105. Together, these pleadings are sufficient to demonstrate traceability for purposes of Article III standing at this stage.

Therefore, Plaintiffs have sufficiently pleaded their constitutional standing. The Court now turns to the merits of their claims.

## II.    The Sufficiency of Plaintiffs' Claims

Plaintiffs bring three sets of claims: common law claims under New York law; claims related to improper computer and data access under Federal and California law; and claims related to consumer protection statutes under New York, California, and Florida law. The Court takes each set in turn.

### A.    The Common Law Claims

Plaintiffs bring four common-law claims against Defendants: (1) unjust enrichment, *see* Compl. ¶¶ 172-84; (2) interference with prospective economic advantage, *id.* ¶¶ 185-92; (3) intentional interference with contractual relations, *id.* ¶¶ 193-98; and (4) conversion, *id.* ¶¶ 199-

12

203. Although Plaintiffs bring these claims "[o]n behalf of Plaintiffs and the class under New York law, and, in the alternative, on behalf of the state subclasses under their respective state laws," Compl. at 55, 57, 59, 61, the parties apply only New York law to each claim in their briefs, *see* Br. at 15-22; Opp. at 11-20; Reply at 7-10. Accordingly, the Court will do the same. *See Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000))). The Court addresses each claim in turn.

### 1. Unjust Enrichment

Count I of the Complaint asserts a claim for unjust enrichment. Compl. ¶¶ 172-84. Unjust enrichment "lies as a quasi-contract claim" in New York, one that gives rise to "an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) (quoting *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005)). A plaintiff pleading unjust enrichment "must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 608 (2d Cir. 2024) (quoting *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012)). The second element requires more than a defendant being enriched instead of a plaintiff; rather, "[t]o prevail, the proponent of the cause of action must establish that *it* conferred a benefit on the other party." *Maple Med., LLP v. Scott*, 138 N.Y.S.3d 61, 77 (N.Y. App. Div. 2020) (emphasis added); *see also Finkel v. E.A. Techs., Inc.*, No. 11-cv-05662 (KAM) (JO), 2014 WL 4364757, at *6 (E.D.N.Y. Sept. 3, 2014) ("[An] essential element of [an] unjust enrichment claim is that plaintiff conferred a benefit upon defendant."). Moreover, "a plaintiff cannot succeed on an

unjust enrichment claim unless it has a sufficiently close relationship with the other party," and a defendant's "mere knowledge" of another party's existence or actions is not enough. *Georgia Malone*, 973 N.E.2d at 746.

Here, Plaintiffs allege that Defendants have "misappropriate[d] [their] commissions." Compl. ¶ 3. Specifically, Plaintiffs allege that (1) Plaintiffs create content promoting certain products and include, in that content, affiliate links for their audience to click to purchase the promoted products from merchants, *id.* ¶ 44; (2) consumers use those affiliate links to navigate to the merchant's site, *id.*; (3) because those links are the last external links consumers click before reaching that site, Plaintiffs are entitled — pursuant to the terms of their contracts with the merchants — to a commission once the consumers complete a purchase of the linked product from the merchant's site, *id.* ¶¶ 48, 57; but (4) Defendants' browser extension "artificially simulates a referral click" once the consumer is on the merchant's site, which "displace[s]" Plaintiffs' affiliate links as the last click "even though the consumer clicked on the [Plaintiffs'] specific affiliate link, not RetailMeNot's, to visit the merchant's website and make a purchase," *id.* ¶ 3; and thus (5) the browser extension "enables Defendants to claim credit for customer referrals they did not generate and pocket commission payments they did not rightfully earn," *id.* ¶ 4. *See also id.* ¶ 57 (alleging that Plaintiffs' entitlement to commissions arises "when their affiliate link was the last *external* link that directed the consumer to the merchant's webpage"), ¶ 96 (alleging that browser extension "simulat[es] a click by the consumer on an external RetailMeNot affiliate link, despite the fact that the consumer never left the merchant's webpage and never clicked on any RetailMeNot affiliate link").

These allegations — specifically that Defendants "pocket commission payments," *id.* ¶ 4; *see also id.* ¶ 81 — sufficiently plead that Defendants have been enriched. *See, e.g.*, *Marcal Fin. SA v. Middlegate Sec. Ltd.*, 164 N.Y.S.3d 587, 589-90 (N.Y. App. Div. 2022) (requiring

14

allegation that defendant be "in receipt" of benefit in question).  But the pleadings are otherwise inadequate.  In particular — and as Defendants point out, *see* Br. at 16 — Plaintiffs do not plausibly allege that Plaintiffs conferred a benefit upon Defendants: They allege that Defendants interceded in sales they generated and, in that way, improperly received a benefit from the merchants in the form of a commission.  *See* Compl. ¶ 65 (alleging that browser extension "credit[s] RetailMeNot with the customer referral, the purchase, and ultimately the commission generated by the sale"); *id.* ¶ 48 (alleging that "the online merchant . . . provide[s] a commission"); *id.* ¶ 81 (alleging that Defendants are "paid a commission by the online merchant").  That the benefit was provided, even if allegedly unjustly, from the merchant instead of from the Plaintiffs is fatal to Plaintiffs' unjust enrichment claim.  *See Maple Med.*, 138 N.Y.S.3d at 77 (dismissing unjust enrichment claim by medical practice that sought return of demutualization compensation that insurer paid to physician employees, because plaintiff did "not provide[] the benefits in question to its employee[s] — those benefits are provided by the plan of conversion," even though employer had paid insurance premiums on employees' behalf); *see also Silvercorp Metals, Inc. v. Anthion Mgmt. LLC*, No. 150374/2011, 2012 WL 3569952, at *1, 12 (N.Y. Sup. Ct. Aug. 16, 2012) (dismissing unjust enrichment claim where defendant published defamatory articles about plaintiff to drive down stock price and profit from short positions, because "[t]he profits defendants received simply did not come from [plaintiff], but from the shares bought and sold on the stock exchanges").[2]

---

[2] One paragraph of the Complaint seeks to mold the pleadings to the elements of unjust enrichment by contending that Plaintiffs "conferred a benefit on Defendants" by "dr[iving] prospective customers to merchants' web pages . . . to make purchases that resulted in RetailMeNot's receipt of . . . payments," *id.* ¶ 174, but even that paragraph makes clear that the pleaded benefit is the payment, not the driving.  In any event, this paragraph of the Complaint is a legal conclusion, not a factual allegation, and the Court need not credit "legal conclusions masquerading as factual conclusions" in evaluating a motion to dismiss.  *Rolon*, 517 F.3d at 149.

The pleadings here are additionally deficient for their failure to allege a sufficiently close relationship between Plaintiffs and Defendants.  Indeed, Plaintiffs do not plead that there is any relationship at all between them and Defendants, and courts in this District routinely dismiss unjust enrichment claims for that type of omission.  *See, e.g.*, *Moshik Nadav Typography LLC v. Banana Republic, LLC*, No. 20-cv-08325 (JMF), 2021 WL 2403724, at *2 (S.D.N.Y. June 10, 2021) (dismissing unjust enrichment claim where plaintiff alleged defendant had misappropriated its design, because even "the fact that [plaintiff] ha[d] designed typefaces and logotypes for other entities in [defendant]'s industry falls short of plausibly suggesting that the two companies had any relationship, dealings, or communications"); *INV Accelerator, LLC v. MX Techs., Inc.*, No. 19-cv-02276 (AJN), 2020 WL 882902, at *3 (S.D.N.Y. Feb. 24, 2020) (dismissing unjust enrichment claim where plaintiff alleged that defendant purposely structured its acquisition of company to disentitle plaintiff to cash payments from company, but failed to "allege that [defendant] had 'dealings' or really any relationship with [plaintiff] . . . [or] even allege any contact between [plaintiff] and [defendant]"); *Graham v. Take-Two Interactive Software, Inc.*, No. 19-cv-02183 (GBD) (SDA), 2019 WL 8111915, *1-2 (S.D.N.Y. Nov. 25, 2019) (dismissing unjust enrichment claim where plaintiff alleged that defendant used his marks in video game, but failed to allege "that he had any dealings . . . [or] any communications with [defendant]"), *report and recommendation adopted*, 2020 WL 408408 (S.D.N.Y. Jan. 24, 2020).

Therefore, the Complaint fails to adequately plead unjust enrichment.  In light of the foregoing analysis, the Court need not address the parties' arguments as to whether equity and good conscience would permit Defendants to retain the commissions they have received.  *See* Br. at 15-16; Opp. at 11-12; Reply at 7.

### 2. Interference with Prospective Economic Advantage

Count II of the Complaint asserts a claim for interference with prospective economic advantage. Compl. ¶¶ 185-92. A plaintiff bringing such a claim in New York "must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). With respect to the third element, "New York courts have generally held that the defendant's wrongful conduct must 'amount to a crime or an independent tort,'" and that such conduct "must be directed 'at the party with which the plaintiff has or seeks to have a relationship,' rather than at the plaintiff." *Just Play, LLC v. A.S. Plastic Toys Co.*, No. 19-cv-09399 (ER), 2022 WL 580876, at *4 (S.D.N.Y. Feb. 25, 2022) (quoting *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07-cv-09694 (LAP), 2009 WL 1110783, at *2 (S.D.N.Y. Apr. 21, 2009)); *accord Bradbury v. Israel*, 168 N.Y.S.3d 16, 18-19 (N.Y. App. Div. 2022).

Importantly, in New York, this claim is brought "[i]n the absence of a contractual relationship with a third party." *Prepaid Ventures, Ltd. v. Paul Compton*, No. 18-cv-02102 (DLI), 2022 WL 18859053, at *13 (E.D.N.Y. Dec. 21, 2022). Indeed, its purpose is to remedy interferences that sever an inchoate relationship between two parties that would otherwise have led to a contract or other economic dealings. *See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 248 (S.D.N.Y. 2014) ("[T]he plaintiff must establish that it 'would have entered into an economic relationship with the third party but for the defendant's wrongful conduct.'" (alteration adopted) (quoting *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 246 (S.D.N.Y. 2013))); *see also NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496-97 (N.Y. 1996) (explaining that this claim is meant to protect a plaintiff's "less substantive, more

17

speculative interest in a prospective relationship," which is "by definition not its contract rights" (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 445 (N.Y. 1980))).  It follows that, "[i]f the defendant's act disrupts the performance of a contract already formed, the plaintiff's recourse lies under . . . [i]nterference with [c]ontract."  Restatement (Third) of Torts § 18 cmt. a (Am. L. Inst. 2020); *see also Nicosia v. Bd. of Mgrs. of Weber Condo.*, 909 N.Y.S.2d 412, 415 (N.Y. App. Div. 2010) ("Because plaintiff and [third party] had already entered into a contract, plaintiff failed to plead any prospective business relationship. We cannot see how plaintiff would have any relationship with [third party], separate from the contract, upon which to recover."); *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 718-20 (S.D.N.Y. 2014) (dismissing interference with prospective economic advantage claim concerning "initial, unwritten settlement among" parties where the alleged interferences "postdate the very business relationship between [p]laintiff and [third party] with which [defendants] are alleged to have interfered").  Here, Plaintiffs ground their prospective economic advantage claim in their allegation that the RetailMeNot browser extension "caused online merchants to breach their contracts with Plaintiffs."  Compl. ¶ 190.  That is a claim for interference with an existing contract, not with a prospective business relationship, and it can be dismissed for this reason alone.

Even construing the merchants' relationship with Plaintiffs as a prospective business relationship and not a contractual one, however, the claim is still not sufficiently pleaded.  To be sure, the Complaint adequately pleads that Plaintiffs have business relationships with third parties by alleging that they have affiliate marketing contracts with various merchants.  *See, e.g.*, Compl. ¶ 53.  But Plaintiffs fail to allege that Defendants are directing their conduct at the merchants, as this claim requires.  *See Just Play*, 2022 WL 580876, at *4 ("The wrongful conduct must be directed at the party with which the plaintiff has or seeks to have a relationship,

18

rather than at the plaintiff." (internal quotation marks and citation omitted)); *see also Bradbury*, 168 N.Y.S.3d at 19 ("[A]ny conduct constituting 'wrongful means' must be directed at the third parties with whom plaintiff sought to have the relationship."). Instead, Plaintiffs allege that the conduct is directed at Plaintiffs themselves, or possibly at the consumers' computers. *See* Compl. ¶¶ 81-82 (alleging that "[t]he result" of Defendants' conduct "is that RetailMeNot steals the last-click attribution for the sale of the online merchant's product or service and is paid a commission . . . [and] the creator is left without a commission"); *id.* ¶¶ 99-100 (alleging that browser extension "forc[es] the consumer's browser to refresh a merchant's webpage" by "alter[ing] cookies that [it is] not authorized to alter" and, in this way, "steal[s] the commission from the creator"). Plaintiffs have also not pleaded any injury to their relationships with the merchants, as this claim additionally requires. *See Raedle*, 670 F.3d at 417 (requiring "injury to the relationship" rather than to plaintiff). Plaintiffs' only justification for that omission is that they have pleaded "injury," Opp. at 14, which so ignores the pleading requirements for this claim as to concede Plaintiffs' failure to meet them.

Therefore, the Complaint fails to plead that Defendants have interfered with Plaintiffs' prospective economic advantage, and this claim must be dismissed.

### 3. Intentional Interference with Contractual Relations

Count III of the Complaint asserts a claim for intentional interference with contractual relations. Compl. ¶¶ 193-98. This tort is more frequently referred to as "tortious interference with contract." *Compare Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019), *with G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995), *and Joan Hansen & Co., Inc. v. Everlast World's Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 391 (N.Y. App. Div. 2002) (all setting forth same elements under these two labels). It has five elements in New York: "the existence of a valid contract between the plaintiff and a third party, defendant's

19

knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *EXRP H14 Holdings LLC v. LS-14 Ave LLC*, 236 N.Y.S.3d 38, 39 (N.Y. App. Div. 2025) (citation omitted); *accord Rich*, 939 F.3d at 126-27.

In satisfaction of the first element, Plaintiffs allege that they have affiliate marketing contracts with various merchants and that, "[p]ursuant to those contracts, Plaintiffs . . . are entitled to commissions on converted sales when the consumer's final *external* click before reaching a merchant's website was a click on the creator's affiliate link." Compl. ¶ 53. Defendants argue that Plaintiffs have not pleaded the second element of the claim (that Defendants had actual knowledge of the contracts) or the fourth element (actual breach of these contracts). *See* Br. at 18-20. Defendants argue further that Plaintiffs have failed to plead that Defendants are the but-for cause of any breach of contract, as well as that Defendants' conduct is "shield[ed]" by "competition privilege." *Id.* at 20. The Court disagrees with Defendants.

As to the second element, Defendants stress that Plaintiffs have not pleaded that Defendants had knowledge "of any specific provisions of specific contracts Plaintiffs had with specific merchants." *Id.* But knowledge of "the fact of the agreement" is sufficient to satisfy the second element of this claim; it is "not necessary that [a] defendant know the full details." *EXRP H14 Holdings LLC*, 236 N.Y.S.3d at 39; *see also Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*, No. 20-cv-00078 (PAE), 2021 WL 1199430, at *8 (S.D.N.Y. 2021) ("With regard to the second element [of interference with contract], a defendant must 'have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required.'" (quoting *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020))). As Plaintiffs argue, the Complaint alleges that Defendants "specifically designed" the browser extension to recognize and replace Plaintiffs' affiliate

20

tracking codes, because Defendants knew that this process would entitle Defendants to contractually promised commissions on converted sales in place of Plaintiffs. *See* Compl. ¶¶ 187, 195. Indeed, Defendants' knowledge of affiliate marketing stems from their own position in that market — that is, because Defendants themselves contract with merchants and are assigned affiliate tracking codes as part of their agreements, Defendants know that Plaintiffs' tracking codes signify their own similar contractual relationships with those merchants. *See* Compl. ¶ 177 ("Defendants know that creators are entitled to commissions for driving traffic to merchants."). Moreover, Defendants conceded at oral argument that they have actual knowledge of Plaintiffs' contracts and merely disclaimed knowledge of those contracts' specific terms. *See* Mar. 5, 2026 Transcript ("Tr.") at 71:11-18 (arguing that RetailMeNot has "a general awareness of the affiliate marketing process" and "knows that [P]laintiffs are among the competitors in the market who are also competing for those commissions with their own affiliate links," but "[w]hat [RetailMeNot] do[es]n't know is what kind of affiliate marketing agreement [Plaintiffs] particularly have"). As discussed, that level of knowledge is enough to satisfy Plaintiffs' pleading burden.

Plaintiffs have also adequately pleaded that Defendants' conduct intentionally causes merchants to breach their contracts with Plaintiffs (by paying commissions to Defendants even when those commissions are contractually owed to Plaintiffs), and that Plaintiffs have suffered damages as a result of that conduct. *See, e.g.*, Compl. ¶¶ 53-57 (describing Plaintiffs' contractual terms entitling them to commissions when their affiliate links are "the consumer's final external click before reaching a merchant's website"); ¶¶ 64-68 (describing process through which browser extension "artificially manufacture[s]" a last click through RetailMeNot); ¶¶ 58-63 (describing how browser extension deprives Young of contractually entitled commission payment from merchant). Defendants argue that Plaintiffs have failed to "allege that merchants

21

misapplied their attribution rules, or otherwise deviated from their agreements," Br. at 19, but the pleadings do just that: Plaintiffs contend that they are the last external click before a converted sale, and that Defendants' conduct "tricks the browser" into thinking otherwise, "thereby causing the online merchant to credit RetailMeNot with the customer referral and any commission earned on the product sale," Compl. ¶ 96. Indeed, the Complaint expressly pleads that "the RetailMeNot browser extension caused online merchants to breach their contracts with Plaintiffs and Class Members by paying RetailMeNot, instead of Plaintiffs and Class Members, the monies that they rightfully earned as the true originators of sales arising from their affiliate marketing links." Compl. ¶ 190; *see also* Compl. ¶¶ 196-197. Defendants fault Plaintiffs for not alleging that their browser extension was the *only* cause of this breach, and they speculate that perhaps the consumers would not have consummated their purchases at all if not for RetailMeNot, or that maybe the consumers would have made subsequent affiliate clicks after Plaintiffs'. *See* Br. at 19. At this early stage, that conjecture as to but-for causation does not undermine the Complaint's express causation allegations.

To be sure, at least one of the publicly available merchant agreements Plaintiffs cite to and quote from in the Complaint does not fully support their allegation that merchants pay commissions based on a last *external* click, such that the merchants have breached their contracts with Plaintiff by paying RetailMeNot these commissions. *See* Compl. ¶ 53.[3] Indeed, the Best Buy agreement states that it awards commissions for "Qualifying Purchases . . . made via the

---

[3] The Complaint does not attach the contracts, but the Complaint sufficiently quotes from and relies upon them to make them integral to the Complaint and, thus, proper for the Court to review on this motion to dismiss. *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it [on a motion to dismiss] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995 (per curiam))).

intentional click by a Customer of a Qualifying Link," and it defines "Qualifying Link" merely as "an Internet connection between any of your Properties and a Best Buy Authorized Property that is provided or authorized by Best Buy to be displayed, distributed or placed by you pursuant to this Agreement in a manner that drives completion of Qualifying Purchases." Best Buy Terms & Conditions for Creators, https://www.bestbuy.com/site/best-buy-affiliate-program/creator-terms-and-conditions/pcmcat1741014869361.c. The Best Buy terms further define "Properties" as "your website or other presence (including, without limitation, social media sites, mobile applications, email marketing, forums, apps, *and software*) owned, operated, used, or distributed by and preapproved by Best Buy to link to one or more Best Buy Authorized Properties." *Id.* (emphasis added). These terms appear to foreclose Plaintiffs' argument that Defendants have caused Best Buy to breach its contract with Plaintiffs, as nothing within them expressly requires a last external click or excludes a software-based browser extension like Defendants' from earning a commission through an affiliate link.

On the other hand, the Walmart agreement, *see* Compl. ¶ 55, also contains no mention of external clicks, but it defines "Qualifying Link" as "a link from an Affiliate Website or social media post to our Site." Walmart Creator Terms & Conditions, https://creator.walmart.com/terms. Those terms' definition of "Affiliate Website" — "every website and/or social media post/Content that links to our Site through a Qualifying Link" — appears to exclude browser extensions; yet the Walmart terms also provide that "web widget[s] . . . may be considered a Qualifying Link for purposes of this Agreement," without providing a definition of that term. *Id.* Regardless, to the extent there may be conflicting entitlements created by inconsistencies or ambiguities in Plaintiffs' and Defendants' contracts with the same merchants — *see, e.g.*, Tr. at 13:11-14 (Defendants' counsel: "[I]f the merchant is giving RetailMeNot the commission, then necessarily, the merchant believes that what

23

RetailMeNot did was consistent with the agreement") — those present a merits issue, and at a later stage Plaintiffs will be required to prove the actual breach of these contracts; at this stage, Plaintiffs have satisfied their pleading burden.[4]

Finally, the Court is unpersuaded by Defendants' argument as to competition privilege. *See* Br. at 20. It is not clear from the face of the Complaint whether Defendants and Plaintiffs are, in fact, competitors in the same market. But even assuming they are, New York law does not recognize competition as a complete defense to tortious interference with contract so as to require dismissal at this stage. *See Guard-Life*, 406 N.E.2d at 448-49 (explaining that the "status as competitor does not protect the interferer from the consequences of his interference with an existing contract, [even if] it may excuse him from the consequences of interference with prospective contractual relationships"); *see also* Br. at 20 (citing authority on competition privilege but only as it relates to "future relation[s] between the parties" rather than existing contractual relations (quoting Restatement (Second) of Torts § 768 cmt. I)).

Therefore, Plaintiffs have sufficiently pleaded intentional interference with contractual relations, and Defendants' motion to dismiss this claim is denied.

---

[4] During oral argument, Defendants argued that Plaintiffs had conceded that there was no breach of contract between Plaintiffs and the merchants. Tr. 65:2-6, 66:8-12. Plaintiffs' statements during oral argument on this point were somewhat unclear. Plaintiffs' counsel did say that "Plaintiffs don't have, under the facts alleged in the complaint, a breach of contract claim against the merchants." *Id.* 36:7-17. However, the argument was in the context of explaining that Plaintiffs were not bringing claims against the merchants for failing to give Plaintiffs their owed commissions because the merchants were tricked into paying RetailMeNot instead of Plaintiffs. Tr. 26:12-27:6 ("The reason that the merchant is not liable is, they don't know and they can't know."). Given that the Complaint expressly pleads that Plaintiffs' contracts with the merchants were breached, Compl. ¶ 190, the Court will accept that allegation for purposes of the motion to dismiss, even though Plaintiffs will ultimately have to prove that is the case.

### 4. *Conversion*

Count IV of the Complaint asserts a claim for conversion.  Compl. ¶¶ 199-203.

Generally, "[t]o state a claim of conversion, the plaintiff must allege that (1) the party charged

has acted without authorization, and (2) exercised dominion or a right of ownership over

property belonging to another, (3) the rightful owner makes a demand for the property, and

(4) the demand for the return is refused."  *Rynasko v. New York Univ.*, 63 F.4th 186, 196 (2d Cir.

2023) (quoting *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 133 (2d Cir. 2022)).

The two latter elements do not apply, however, "[w]here the initial possession of the property

was unlawful."  *Great W. Ins. Co. v. Graham*, No. 18-cv-06249 (VSB), 2020 WL 3415026, at

*36 (S.D.N.Y. June 22, 2020).  With respect to the second element, the defendant's control must

be to "the *complete* exclusion of the rightful possessor."  *Broker Genius, Inc. v. Seat Scouts LLC*,

No. 17-cv-08627 (SHS), 2018 WL 2214708, at *5 (S.D.N.Y. May 14, 2018) (quoting *Harper &*

*Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other*

*grounds*, 471 U.S. 539 (1985)).

Plaintiffs contend that Defendants are liable for conversion because Defendants

wrongfully exercised control over Plaintiffs' "affiliate tracking codes" — which Plaintiffs "had a

right to possess" — when Defendants "intentionally caus[ed] the tracking codes to be

overwritten with RetailMeNot's tracking codes."  *Id.* ¶ 200-201.  Plaintiffs attempt to support

this theory by pointing the Court to *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272 (N.Y.

2007), "in which the court held that 'electronic records that were stored on a computer and were

indistinguishable from printed documents are subject to a claim of conversion in New York.'"

Opp. at 18 (quoting *Thyroff*, 864 N.E.2d at 1278) (alterations adopted).  Plaintiffs then assert,

reciting *Thyroff*, that affiliate tracking codes "are electronic and stored on computers" and are

"indistinguishable from physical documents."  *Id.*  Defendants argue that New York law does not

recognize claims for conversion of intangible property unless that property "arises from or merges with a document symbolizing ownership." Br. at 21; *see also* Reply at 10. The Court disagrees with both parties, but finds that Plaintiffs do not state a claim for conversion.

Before *Thyroff*, intangible property was convertible under New York law only if it was "united with a tangible object" in the way that, for example, "intangible shares of stock . . . 'are merged in stock certificates . . . [such] that conversion of the certificate may be treated as a conversion of the shares of stock represented by the certificate.'" *Thyroff*, 864 N.E.2d at 1276 (quoting *Agar v. Orda*, 190 N.E. 479, 480 (N.Y. 1934)). This was known as the "merger doctrine." *Id.* (internal quotation marks omitted). In *Thyroff*, the New York Court of Appeals "expand[ed] the scope of conversion" beyond merger by holding that the plaintiff's "electronic records of customer contacts and related data" — which he had stored on leased computers and which his employer later "took possession of" — were also convertible. *Id.* at 1277-78. In so holding, the court explained that "it generally is not the physical nature of a document that determines its worth, [but rather] the information memorialized in the document that has intrinsic value," such as "[a] manuscript of a novel" in either electronic or paper form. *Id.* at 1278. Thus, the plaintiff's records "ha[d] value to him regardless of whether the format in which the information was stored was tangible or intangible." *Id.*

*Thyroff* does not aid Plaintiffs here. The Complaint does not plead, and Plaintiffs do not argue, that Plaintiffs' affiliate tracking codes have any intrinsic value; rather, they are important to Plaintiffs because they signify an entitlement to commission once placed on a cookie in the consumer's web browser. *See* Opp. at 18-19 (likening tracking codes embedded in browser cookies to "a physical piece of paper stating 'pay person X for this referral'"); *id.* at 18 n.9 (arguing that "tracking codes establish a right to payment"). To the extent Plaintiffs may wish to invoke a merger theory here, however, they cannot do so, because the tracking codes merge only

26

with a right to payment, and "the mere right to payment cannot be the basis for a cause of action alleging conversion" in New York. *Barker v. Amorini*, 995 N.Y.S.2d 89, 91-92 (N.Y. App. Div 2014) (quoting *Daub v. Future Tech Enter., Inc.*, 885 N.Y.S.2d 115, 118 (N.Y. App. Div. 2009)); *see also Cap. One*, 2025 WL 1570973, at \*11 (analyzing similar conversion claim under Virginia law and finding that "[p]laintiffs have not alleged that tracking codes arise from or merge with a document symbolizing ownership").

But even assuming Plaintiffs had sufficiently pleaded a property right in their affiliate tracking codes, their conversion claim would still fail, because they have not alleged that Defendants' interference resulted in Plaintiffs' complete exclusion from these codes. *See Broker Genius*, 2018 WL 2214708, at \*5. Recall that affiliate tracking codes are "embedded in" a creator's affiliate link, Compl. ¶ 59, Image 2, which is "a unique URL associated only with that specific creator," *id.* ¶ 35. When a consumer clicks that link, the embedded code is placed on a cookie, which is saved temporarily to the consumer's web browser. *Id.* ¶¶ 45-46. Later, Defendants' browser extension deletes Plaintiffs' tracking code from the cookie and writes in RetailMeNot's instead. *Id.* ¶ 100. Plaintiffs allege that the conversion occurs at this last step, when Defendants remove their tracking codes from the cookie. *Id.* ¶ 201-02. But Plaintiffs do not allege that this removal entirely deprives Plaintiffs of their possession of their tracking codes — for example, there is no allegation in the Complaint that Defendants' usurpations block Plaintiffs from using their unique codes in future transactions, or require the merchant to generate new unique codes for Plaintiffs because Defendants have taken over theirs. *Cf. Am. Lecithin Co. v. Rebmann*, No. 12-cv-00929 (VSB), 2020 WL 4260989, at \*19-20 (S.D.N.Y. July 24, 2020) (holding that "[d]efendant's transferring the [d]omain [n]ames to [himself] and continuing to retain them" supported conversion claim, and collecting cases holding same). Indeed, the Complaint does not allege that these affiliate tracking codes (or the links in which

they are embedded) are unique to each transaction.  Rather, an iteration of the same unique

affiliate tracking code is placed on a cookie any time any consumer clicks Plaintiffs' affiliate

link, like an ink stamp blotted on endless pieces of paper.  *See* Compl. ¶ 45.  To the extent

Plaintiffs' affiliate tracking codes have value to Plaintiffs, that value comes from their placement

on the cookie, because it is the cookie as a whole (not the tracking code in isolation) that ties

Plaintiffs to the sale and entitles them to a commission.  *See, e.g.*, Compl. ¶ 46 (explaining that

"the cookie tracks the consumer's activity . . . to determine whether the consumer ultimately

purchases a product or service"); *id.* ¶ 60 (explaining that merchant "knows to award Plaintiff

Young with a commission . . . because the affiliate tracking code (which is stored [on a cookie]

in the consumer's browser) associates Plaintiff Young with the purchase").  Plaintiffs do not

plead or argue that they have a property interest in the cookie that would permit them to bring a

conversion claim rooted in Defendants' exercising dominion over and altering it — yet that is, at

bottom, what Plaintiffs' conversion claim would require.

In short, there is simply no theory of conversion under which the Complaint states a

claim under the facts alleged, and the claim must accordingly be dismissed.

**B.    The Computer Fraud Claims**

Plaintiffs next assert computer-fraud claims against Defendants, one under a federal

statute and the other under a California statute.  The Court addresses these in turn.

*1.  Computer Fraud and Abuse Act*

Count V of the Complaint asserts a claim for violation of the Computer Fraud and Abuse

Act of 1986 ("CFAA"), 18 U.S.C. § 1030 *et seq.*  Compl. ¶¶ 204-17.  That statute concerns

"fraud and related activity in connection with computers."  *United States v. Cuomo*, 125 F.4th

354, 363 (2d Cir. 2025).  As relevant here, CFAA prohibits "knowingly and with intent to

defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized

28

access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4). To "exceed authorized access" "means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." *Id.* (quoting 18 U.S.C. § 1030(e)(6)).

Here, Plaintiffs allege that Defendants "exceed their authorized access" to consumers' computers when their browser extension overwrites Plaintiffs' affiliate tracking codes on the consumers' cookies. Compl. ¶ 207. They further allege that this "disrupt[ion] [of] the commission attribution process, including communications between the merchant website and the merchant servers" is an "interruption of service" through which Plaintiffs "have lost substantial revenue from valuable commissions that were improperly diverted to RetailMeNot." *Id.* ¶¶ 215-16. Defendants counter first that their browser extension does not access anyone's computer and, second, that even if it did, Defendants have not exceeded any authorization, because consumers have to click on the browser extension to initiate the overwrite process, and because consumers must agree to Defendants' terms of service to download the extension in the first instance. Third, and finally, Defendants argue that, even if they exceeded their authorization, they have not interrupted any service within the meaning of CFAA. *See* Br. at 23-25; Reply at 10-11. The Court agrees with Defendants on their second point, and therefore need not address the first or third.

The Complaint fails to sufficiently allege that the browser extension exceeds its authorized access to consumers' computers. Indeed, Plaintiffs allege that the consumers here voluntarily downloaded the browser extension. *See* Compl. ¶¶ 23-24 (alleging that browser extension is "a free tool" that consumers "download[] . . . from their web browser's extension

29

store").  Moreover, consumers must "actively engage with the browser extension" to "facilitate [its] technical capability" to initiate the overwrite process.  *Id.* ¶ 76; *see also id.* ¶ 77 ("These consumer's clicks, in turn, trigger the extension to open the hidden mini-tab.").  Thus, the Complaint alleges that consumers are granting this permission not only as an initial matter upon downloading the browser extension, but also in real time during the transactions at issue. Therefore, to the extent Plaintiffs conclude that consumers cannot grant such permission, *see id.* ¶¶ 211-12, their own pleadings undermine them.

Plaintiffs liken their allegations to those in *WhatsApp Inc v. NSO Group Technologies Limited*, but that case is inapplicable.  There, the defendants created a data program called Pegasus that "reverse engineered" WhatsApp's messenger app to allow the defendants to "intercept communications, capture screenshots, or exfiltrate browser history and contacts from [a] user's device."  *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 659 (N.D. Cal. 2020).  Users did not install Pegasus willingly: the defendants "implanted" it on users' phones by calling them in what "appear[ed] as a legitimate call" but in fact "inject[ed] [Pegasus's] malicious code into a device's memory whether or not the user answered the call."  *Id.* at 659-60. Through these calls, which WhatsApp's settings would have blocked if the defendants had not disguised them as legitimate, the defendants "caused their malicious code to be transmitted over WhatsApp's servers."  *Id.* at 660.  The Court concluded that the plaintiffs had adequately pleaded the "exceeds authorized access" element of CFAA by alleging that defendants (who were, themselves, WhatsApp users) had permission to access WhatsApp servers for regular messaging, but had evaded WhatsApp's "security features and manipulat[ed] the technical call settings" to carry out their Pegasus scheme.  *Id.* at 681.  Those facts do not fit the allegations here, in which consumers choose to download the RetailMeNot browser extension.  Not only that, but consumers choose to use the extension (or choose not to use it) during each transaction.  *See*

Compl. ¶¶ 23-24, 76-77; *see also In re iPhone Application Litig.*, No. 11-md-02250, 2011 WL 4403963, at *1, *11 (N.D. Cal. Sept. 20, 2011) (dismissing CFAA claim based on iPhone apps' "collect[ing] and mak[ing] use of, for commercial purposes, [users'] personal information without user consent or knowledge," "[w]here the software that allegedly harmed the phone was voluntarily downloaded by the user," and opining that "users would have serious difficulty pleading a CFAA violation" based on exceeding authorized access on similar facts).

To be sure, the Complaint alleges that Defendants' overwriting process "is not disclosed in [Defendants'] terms of service or privacy policy, or in any information that is disclosed to consumers who install the extension in the ordinary course," and therefore "[c]onsumers do not expect the RetailMeNot browser extension to operate in this manner or to alter this data." Compl. ¶ 213. But these policies do not support that allegation.[5]

The Terms of Use "govern [consumers'] use of [Defendants'] interactive websites, mobile and connected applications, software, and all other online interactive features and services." *See* Ziff Davis, LLC Terms of Use ("Terms of Use") § 1, https://www.ziffdavis.com/terms-of-use. They explain that "[t]he use of vouchers and discount codes implies that the user of the Site clicks on the buttons 'Display the code and launch the site' or 'display the site' or even on the graphic banner of the Site. These buttons/links cause the opening in a new browser window of the merchant site receiving the reduction voucher [the

---

[5] The Complaint does not attach these terms, but this allegation sufficiently relies on them to make them integral to the pleadings. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (noting that courts "generally" review materials outside of the pleadings "when the material considered is a 'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint.'" (quoting *Chambers*, 282 F.3d at 152). Moreover, Defendants provided their Terms of Service and Privacy Policy in their briefing, and Plaintiffs, rather than objecting or discouraging the Court from reviewing them, discussed and quoted from them in their opposition brief and at oral argument. *See, e.g.*, Opp. at 21 & n.12; Tr. at 46:11-47:3.

consumer] ha[s] selected." *Id.*  They further advise that Defendants "may receive a commission, fee and/or other compensation on some clicks or purchases made on, through or linked from the services," that is, if the consumers "(i) click on certain ads or links on [Defendants'] websites, emails or newsletters, or (ii) purchase a product or service after clicking a link." *Id.* § 5 (capitalization omitted).

The Terms of Use also "incorporate[] by reference" "[t]he applicable privacy policy." *Id.* § 20; *see also* Ziff Davis Shopping Privacy Policy ("Privacy Policy") § 1, https://www.ziffdavis.com/shopping-privacy-policy ("By using the services provided you have agreed to the Terms of Use (or ToU); and this policy is a part of the ToU.").  The Privacy Policy applicable to RetailMeNot states that Defendants "may . . . collect information about how [users] interact with [Defendants'] various services (or parts of [Defendants'] services)." *Id.* § 2.  That includes "transaction information," such as "information on how [users] interact with the Services, including records of products or services purchased, obtained or considered such as the coupons [users] view and redeem" — as well as "[i]nformation collected through the use of cookies, eTags, Javascript, pixel tags, device ID tracking, anonymous identifiers and other technologies, including information collected using such methods and technologies about . . . [users'] visits to, and interaction and engagement with, the Services."  Privacy Policy § 3.  *See also id.* (explaining that Defendants also collect "[i]nformation about (i) [users'] visits to, and interaction and engagement with the services, content and ads on third party websites, applications, platforms and other media channels . . . , and (ii) [users'] interaction with emails including the content and ads therein . . . , which are collected through the use of cookies and cookie like technologies").  The Privacy Policy further provides that Defendants may "share [users'] personal information" with "[m]erchants, business partners, or advertisers where [users] consented and chose to participate in offers, contests, or other activities." *Id.* § 8.

The Privacy Policy, in turn, links to Defendants' Cookie Policy.  *Id.* § 7; *see* Ziff Davis, LLC Cookie Policy ("Cookie Policy"), https://www.ziffdavis.com/cookie-policy.  The Cookie Policy defines "cookies" as "data that may be stored in the browser [users] use to access our websites."  Cookie Policy.  Under the section titled "What Cookies Do We Use?," the Cookie Policy explains that Defendants use both first-party and third-party cookies, and defines the former as "our own cookies set by Ziff Davis, controlled by us and used to provide information about the usage of the Service."  *Id.*  That section lists, among other types of cookie, "targeting and behavioral advertising cookies," which allow Defendants to "analyze what pages [users] visit on these sites, what products or services [users] view, and whether [users] view or click on ads that are shown to [users].  [Defendants] may also use a cookie to learn whether someone who saw an ad later visited and took an action on the advertiser's site."  *Id.*  Under the section titled, "How Can I Manage My Cookie Preferences?," the Cookie Policy explains that "[m]ost browsers also provide functionality that lets [users] review and erase cookies," but that "[i]f [users] use the Service without changing [their] browser settings, we will assume that [users] are happy to receive all cookies on the Service."  *Id.*

The Court finds that, given all these permissions that users willingly give to Defendants upon choosing to download the browser extension, Plaintiffs do not adequately plead that Defendants have exceeded their authority to access consumers' computers.  In short, and as Plaintiffs plead, users who download Defendants' browser-extension give Defendants far-reaching authority to "read[] and collect[] a massive trove of data as a consumer navigates the web," and to do so "in the background on every webpage visited by the consumer."  Compl. ¶ 28; *see id.* ¶ 70-72 (alleging that "RetailMeNot comprehensively monitors browsing history URLs" and "continuously upload[s] detailed logs to its server" that include "the full-string URL of each web page visited by a consumer").  As the Terms of Use (and the incorporated Privacy

Policy and Cookie Policy) demonstrate, users also agree to allow Defendants to track them by placing and reading multiple forms of cookies on their browser.  *See* Privacy Policy §§ 2-3; *see generally* Cookie Policy.  Users are also informed that Defendants may receive a commission if they purchase a product after clicking Defendants' links.  Terms of Use § 5.  To the extent these Terms do not explicitly state that Defendants will overwrite Plaintiffs' affiliate tracking codes with their own, the Terms encompass that conduct in their broad description of Defendants' "use of cookies, eTags, Javascript, pixel tags, device ID tracking, anonymous identifiers and other technologies."  Privacy Policy § 3.  *See also* Terms of Use § 9 (requiring users to "specifically acknowledge that [Defendants are] not responsible or liable for any unauthorized access to or alteration of [users'] materials, data or other transmissions entered into through" Defendants' products, and Defendants disclaim liability for the "loss or corruption of information or data" (italicization and capitalization omitted)).  Therefore, Plaintiffs' claim under CFAA is dismissed.

### 2.  *California Computer Data Access and Fraud Act*

Count VIII asserts a claim, on behalf of Plaintiff TechSource and the California subclass, under the California Comprehensive Computer Data Access & Fraud Act ("CDAFA"), Cal. Penal Code § 502.  Compl. ¶¶ 244-57.  Specifically, TechSource alleges that Defendants:

> Knowingly access[] and without permission alter[], damage[], delete[], destroy[], or otherwise use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data . . . [;] [k]nowingly access[] and without permission add[], alter[], damage[], delete[], or destroy[] any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network . . . [;] [and] [k]nowingly introduce[] any computer contaminant into any computer, computer system, or computer network.

*Id.* ¶ 245 (quoting Cal. Pen. Code §§ 502(c)(1), (c)(4), (c)(8)).

CDAFA, like its federal counterpart, "is an anti-hacking statute intended to protect Californians' 'computers, computer systems, and data.'"  *In re Zoom Video Commc'ns Inc.*

34

*Privacy Litig.*, 525 F. Supp. 3d 1017, 1043 (N.D. Cal. 2021) (quoting Cal. Pen. Code § 502(a)).

It "provides a private cause of action to any 'owner or lessee of [a] computer, computer system,

computer network, computer program, or data who suffers damage or loss by reason of a

violation of'" the statute. *Cherkin v. PowerSchool Holdings, Inc.*, No. 24-cv-02706, 2025 WL

844378, at *6 (N.D. Cal. Mar. 17, 2025) (quoting Cal. Pen. Code § 502(e)(1)). Accordingly,

regardless of which CDAFA subsection a plaintiff sues under, the harmed computer or data must

be the plaintiff's own. The Complaint alleges that TechSource has "an ownership interest in the

tracking code data that is modified, damaged, and/or destroyed by the RetailMeNot browser

extension." Compl. ¶ 249. Defendants argue that these allegations fail to plead ownership, *see*

Br. at 26; Reply at 11, and the Court agrees.

On this claim, the Court finds the analysis in *Capital One* instructive. There, the court

explained that California courts examining CDAFA claims have "linked [ownership] to the

entity who created the property at issue," such that "where a plaintiff drafts emails or technical

documents that are stored in a third-party's servers and then accessed by a defendant without

authorization, a CDAFA claim is cognizable because the plaintiff author retains some ownership

interest in the data at issue." *Cap. One*, 2025 WL 1570973, at *14 (collecting cases). However,

"where a plaintiff's personal data (*e.g.*, financial information, health data) is collected or

generated by a third-party, and stored by a third-party, the plaintiff may retain 'some form of

interest — for example, a privacy interest,' but cannot necessarily claim an ownership interest in

that data under the CDAFA." *Id.* (quoting *Garrabrants v. Erhart*, 316 Cal. Rptr. 3d 792, 810

(Cal. Ct. App. 2023), and collecting cases). Comparing these disparate concepts to the

pleadings, the *Capital One* court concluded that TechSource had failed to plead "that it creates or

generates the tracking codes at issue and appears to indicate that merchants and affiliate

networks are responsible for creating those codes that are then stored on consumers' browsers." *Id.* at \*15.

TechSource argues that the pleadings before this Court are different, as "Plaintiffs do allege they played a role in the tracking codes' creation because the codes were created and provided to them at their request and for their benefit." Opp. at 24 (citing Compl. ¶¶ 35, 42 & n.15, 53-63). The paragraphs of the Complaint that TechSource cites simply do not support that characterization. The Complaint does not speak of Plaintiffs "requesting" affiliate tracking codes, but rather alleges that "an online merchant will provide an 'affiliate link' to the creator" "[a]s part of the partnership" between the two. Compl. ¶ 35. In fact, the pleadings suggest that the merchants create the codes, and that Plaintiffs have very little say in the specific codes or links they receive. *See id.* ¶ 42 (alleging that affiliate links are "assigned to a creator by an online merchant"). TechSource also does not explain how merely benefiting from these tracking codes is the equivalent of having created them, or how such a benefit establishes its ownership interest within CDAFA's requirements. Furthermore, while TechSource argues that Plaintiffs "possess[] the codes, exercise[] control over them, and c[an] use them as they wish[] . . . 'to the exclusion of others,'" Opp. at 24 (quoting Cal. Civ. Code § 654), the Complaint alleges the opposite: "an ordinary computer owner can see that tracking codes are installed and can delete them." Compl. ¶ 250.

Moreover, as the Court discussed with respect to Plaintiffs' conversion claim, *see supra* Section II.D, TechSource does not allege any damage or alteration to the affiliate tracking codes themselves, but rather alleges that they were deleted from cookies on consumers' web browsers. TechSource is not alleging an ownership interest in the cookies on consumers' web browsers.

For all of these reasons, TechSource fails to state a claim under CDAFA.

C.      The State Law Claims

Plaintiffs' final set of allegations are for violation of the consumer protection and unfair competition laws of New York, California, and Florida.  Taking each of these claims in turn, the Court finds them all insufficiently pleaded.

1. *New York Deceptive Practices Act*

Count VI of the Complaint asserts a claim, on behalf of Plaintiff Young and the putative New York subclass, for violation of the New York Deceptive Practices Act ("NYDPA"), N.Y. Gen. Bus. Law § 349.  *See* Compl. ¶¶ 218-29.

To state such a claim, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1168 (N.Y. 2020); *accord Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).  With respect to the second element, "the New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Id.* (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)); *see also Schlessinger v. Valspar Corp.*, 991 N.E.2d 190, 193 (N.Y. 2013) ("Section 349 does not grant a private remedy for every improper or illegal business practice, but only for conduct that tends to deceive consumers.").  Defendants argue, *see* Br. at 28, that Young's claim founders on the first prong, and the Court agrees.

The "consumer-oriented" element of this claim "is liberally construed," such that "[a] defendant engages in 'consumer-oriented' activity if [its] actions cause any 'consumer injury or harm to the public interest.'"  *Reyes v. Upfield US Inc.*, 694 F. Supp. 3d 408, 419 (S.D.N.Y.

2023) (quoting *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002)).  Here, however, Young has not sufficiently alleged either type of harm.

The Complaint alleges that Defendants' "conduct of surreptitiously overwriting" affiliate codes is "likely to mislead others as to the identity of the affiliate who is entitled to receive a commission in connection with a sale."  Compl. ¶ 225.  The Complaint avoids identifying, in that paragraph, who exactly is misled, but other paragraphs of the Complaint make clear it is the merchants, not the consumers.  *See, e.g.*, *id.* ¶ 48 (alleging that "the online merchant will only provide a commission to the creator associated with the last-used affiliate link"); *id.* ¶ 64 (alleging that browser extension's overwriting process "makes it appear to the browser (and merchant) that the consumer has navigated to the merchant's webpage from a different location on the internet" (emphasis omitted)); *id.* ¶¶ 78-79 (alleging that the overwriting process "falsely indicate[s] to the online merchant that the consumer clicked on RetailMeNot's . . . affiliate link" and permits Defendants to "claim[] credit for referring the consumer to the merchant's website").  In fact, the Complaint explicitly states that the consumers are "unaware of" this entire overwriting process, including the end result: that the browser extension "will cause the merchant to identify RetailMeNot as the referrer."  *Id.* ¶ 100.

In the absence of consumer injury, the Complaint pleads that Defendants harm the public interest because their conduct "steal[s] commissions from creators, harming them economically and, thereby, pushing them out of the market," such that "consumers lose options in the marketplace and their decision-making process is affected."  *Id.* ¶ 224.  Defendants contend that this insufficiently harms the public interest, Reply at 11-12, and the Court agrees.

First, the Complaint pleads no facts to support its conclusory allegation that creators are getting "push[ed] . . . out of the market" by Defendants' conduct.  Compl. ¶ 224.  In fact, there is no other mention of this potential injury in the Complaint, which elsewhere pleads merely that

38

Plaintiffs "would have earned more in commissions but for Defendants' scheme to poach" their commissions. *Id.* ¶¶ 111-12, 118-19, 125-26, 133-34, 140-41, 147-48. Second, and more importantly, the harm to Plaintiffs' business resulting from their being forced out of the content-creation market — even if this assertion were factually supported — would not constitute a harm to the public interest sufficient to give rise to an NYDPA claim. *See, e.g.*, *Fika Midwifery, PLLC v. Independent Health Ass'n, Inc.*, 173 N.Y.S.3d 761, 768 (N.Y. App. Div. 2022) (affirming dismissal of NYDPA claim where "the gravamen of the complaint is . . . harm to plaintiffs' business" (alterations adopted) (quoting *Emergency Enclosures, Inc. v. Nat'l Fire Adj. Co.*, 893 N.Y.S.2d 414, 417 (N.Y. App. Div. 2009))). Consumers having fewer product reviews to watch on social media also falls far short of the type of harm that is required under Section 349, such as harm to public health or safety. *See My Goals Sols., Inc. v. Zeus Networks, LLC*, No. 24-cv-02918 (LTS), 2025 WL 951394, at *10 (S.D.N.Y. Mar. 28, 2025) ("Courts have interpreted § 349's scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety." (alterations adopted) (quoting *Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*, No. 96-cv-05150 (JKF), 1997 WL 137443, at *2 (S.D.N.Y. Mar. 24, 1997))); *see also Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 456 (S.D.N.Y. 2012) ("'[P]otential danger to the public health or safety' satisfies [the NYDPA's harm-to-public-interest] standard." (first alteration in original) (quoting *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003))).

In sum, Young fails to plead that Defendants' actions are consumer-oriented within the meaning of NYDPA, and he therefore fails to state a claim under that law.

39

### 2. *California Unfair Competition Law*

Count VII of the Complaint asserts a claim, on behalf of TechSource and the putative California subclass, for violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*  *See* Compl. ¶¶ 230-43.

As a threshold matter, Defendants argue that TechSource's UCL claim fails because the statute requires that a plaintiff have no adequate legal remedy, and that TechSource has failed to plead such a lack because its loss of commissions "is redressable through damages."  Br. at 30. TechSource contends that it has sufficiently pleaded its lack of legal remedy, and that it is entitled to plead equitable claims in the alternative.  Opp. at 30.  The Court agrees with both parties, but ultimately finds that TechSource has failed to state a claim under the UCL.

A plaintiff "must establish that [it] lack[s] an adequate remedy at law before securing equitable restitution for past harm under the UCL.  And where an adequate legal remedy exists, federal courts are precluded from awarding equitable relief, at least in the form of equitable restitution."  *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025) (internal citations omitted) (quoting *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)); *see also In re Visa Debit Card Antitrust Litig.*, No. 24-cv-07435 (JGK), 2025 WL 3019893, at *11 (S.D.N.Y. Oct. 28, 2025) ("A complaint fails to state a claim under the UCL where it fails to allege the plaintiff lacks an adequate remedy at law.")).  In connection with its UCL claim, TechSource asserts, without elaboration, that it "lacks an adequate remedy at law," Compl. ¶ 231, and it seeks both restitution and an injunction, *id.* ¶ 243.  But "plaintiffs must 'explain why legal remedies are inadequate in their pleading[,]' [and] [c]onclusory allegations are not sufficient."  *Molayem v. Ralph Lauren Corp.*, No. 24-cv-04816 (JGLC), 2025 WL 2773290, at *6 (S.D.N.Y. Sept. 29, 2025) (quoting *Julian v. TTE Tech., Inc.*, No. 20-cv-02857, 2020 WL 6743912, at *4 (N.D. Cal. Nov. 17, 2020)).  The Complaint's conclusory assertion is, therefore,

40

not enough.  Indeed, CFAA provides for compensatory damages, *see* 18 U.S.C. § 1030(g), and thus would provide TechSource a legal remedy here; TechSource's "failure to [sufficiently plead that] claim, however, 'does not make that remedy inadequate.'"  *Qualcomm*, 129 F.4th at 1142 (holding that district court should have dismissed plaintiff's UCL claim upon granting summary judgment to defendant on claim for treble damages under another statute); *see also Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271, 2018 WL 510139, at *2 (N.D. Cal. Jan. 23, 2018) ("Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable" (quoting *Rhynes v. Stryker Corp.*, No. 10-cv-05619, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011))), *aff'd sub nom.*, *Sonner v. Premier Nutrition Corp.*, 962 F.3d 1072 (9th Cir. 2020), *amended by, and reh'g denied*, 971 F.3d 834 (9th Cir. 2020); *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022) (requiring dismissal of "equitable UCL claim" where plaintiff "had an adequate remedy at law through his [California Consumers Legal Remedies Act] claim for damages, even though he could no longer pursue it" because statute of limitations had run).

In its opposition to Defendants' motion to dismiss, TechSource argues simply that "[m]onetary damages may fail to provide complete relief" in the face of its "continuing and future harm."  Opp. at 30.  But that continuing harm is TechSource's "depriv[ation] of referral fees and commission payments."  Compl. ¶ 242.  Such "[m]onetary loss alone will generally not amount to irreparable harm," *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991), however, and "irreparable harm is required for the imposition of any injunctive relief," *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 235 n.9 (2d Cir. 1999) (per curiam)); *see also Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 723 (2d Cir. 1985) ("[I]rreparable harm . . . constitutes an absolute requirement for an award of injunctive relief[.]").  In sum, as in the *Capital One* action,

41

"TechSource has not plausibly alleged that it has no adequate legal remedy, [and] the Court therefore does not have any equitable jurisdiction." *Cap. One*, 2025 WL 1570973, at *16. The UCL claim can be dismissed on this basis alone. *See Qualcomm*, 129 F.4th at 1142 (explaining that UCL's lack-of-legal-remedy requirement "is jurisdictional").

To the extent Plaintiffs argue they are entitled to plead in the alternative, the Court acknowledges that some California courts counsel against "dismiss[ing] UCL claims at the pleading stage when they are based on identical facts as other claims . . . providing the legal remedy of damages," and that "California district courts have generally noted that 'barring claims for equitable relief at the pleading stage is inconsistent with the federal rules that permit pleading in the alternative.'" *Molayem*, 2025 WL 2773290, at *7 (citation modified) (quoting *Adams v. Cole Haan, LLC*, No. 20-cv-00913, 2021 WL 4907248, at *4 (C.D. Cal. Mar. 1, 2021)). This notion arguably did not survive *Qualcomm*, in which the Ninth Circuit held that the district should have dismissed the plaintiff's UCL claim at the pleading stage for failure to adequately plead a lack of remedy at law. *Qualcomm*, 129 F.4th at 1142. *See King v. Nat'l Gen. Ins. Co.*, No. 15-cv-00313, 2025 WL 2494366, at *7-8 (N.D. Cal. Aug. 29, 2025) (distinguishing district court cases allowing alternative pleading as, in light of *Qualcomm*, "not . . . reflect[ing] the current state of this rapidly developing area of Ninth Circuit law"). However, even if alternative pleading is permissible here, or if TechSource had adequately pleaded its lack of legal remedy, TechSource's UCL claim fails on the merits, too.

The UCL "prohibits three separate types of unfair competition: (1) unlawful acts or practices, (2) unfair acts or practices, and (3) fraudulent acts or practices." *Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1136 (S.D. Cal. 2012). Plaintiffs ground their claim only in the first two prongs. *See* Compl. ¶¶ 233-37. The Court addresses these in turn.

42

### a. Unlawful Acts or Practices

To satisfy the "unlawful" prong of the UCL, a plaintiff must allege that the defendant's conduct was "'forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.' In other words, a common law violation such as breach of contract is insufficient." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010) (quoting *Saunders v. Sup. Ct.*, 33 Cal. Rptr. 2d 438, 441 (Cal. Ct. App. 1994)).

Here, the Complaint alleges that Defendants' conduct is unlawful under the first prong of the UCL "because it constitutes conversion, interference with prospective economic advantage, interference with contractual relations, and violation of the Computer Fraud and Abuse Act, New York's General Business Law, and California's Computer Data Access and Fraud Act." Compl. ¶ 237. The first three bases are common law violations and therefore, under *Shroyer*, cannot support a UCL claim under the unlawful prong. *See, e.g.*, *Johnson v. Flagstar Bank, N.A.*, No. EDCV 23-1626, 2024 WL 943944, at *5 (C.D. Cal. Jan. 22, 2024) (dismissing UCL claim under "unlawful" prong supported only by breach of contract); *Foundry IV Inc. v. Hard Carry Gaming Inc.*, No. CV 23-2690-KK-MARx, 2024 WL 211010, at *6-7 (C.D. Cal. Jan. 3, 2024) (rejecting argument that *Shroyer*'s holding "is limited to breach of contract claims," dismissing UCL "unlawful" claim predicated on "breach of implied contract, breach of confidence, and intentional interference with contractual relations," and collecting cases in which California district courts dismissed UCL "unlawful" claims predicated on common law claims such as conversion, intentional interference with contractual relations, and intentional interference with prospective economic advantage); *Lever Your Business, Inc. v. Sacred Hoops & Hardwood, Inc.*, No. 19-cv-01530, 2019 WL 7050226, at *8 (C.D. Cal. Dec. 23, 2019) (dismissing UCL "unlawful" claim predicated on already dismissed conversion claim, "express[ing] skepticism" that conversion could support such a claim even if adequately pleaded, and citing cases).

43

Moreover, because the Court has dismissed Plaintiffs' claims under federal and state statutory law, those claims also do not support a UCL claim under the unlawful prong. *See, e.g.*, *Milan v. JPMorgan Chase Bank, N.A.*, No. 24-cv-06323, 2025 WL 1343566, at *5 (C.D. Cal. May 7, 2025) (dismissing UCL claim under "unlawful" prong based on insufficiently pleaded statutory violations); *Dobest Semiconductor Tech. (Suzhou) Co. v. Cap. Asset Exch. & Trading, LLC*, No. 24-cv-09045, 2025 WL 3254933, at *6 (N.D. Cal. Apr. 25, 2025) ("A UCL claim for unlawful conduct thus fails if the plaintiff fails to state a claim under the predicate law."). Accordingly, TechSource's claim under the UCL's "unlawful" prong necessarily fails.

### b. *Unfair Acts or Practices*

The Complaint alleges that Defendants' conduct is unfair under the second prong of the UCL because it violates California's public policy against interfering with another's prospective economic advantage and is otherwise "unscrupulous, offensive, and substantially injurious." Compl. ¶ 239; *see id.* ¶ 236. In its briefing on this motion, TechSource argues that "California courts apply two tests to determine whether conduct is unfair under the UCL: the 'balancing' test and the 'tethering' test." Opp. at 29. Defendants argue that Plaintiff fails to meet either test. Br. at 29-30; Reply at 12-13. The Court agrees with Defendants.

The UCL balancing test "determin[es] whether a business practice is unfair to consumers" by examining "[that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Nationwide Biweekly Admin., Inc. v. Sup. Ct.*, 462 P.3d 461, 472 n.10 (Cal. 2020) (second alteration in original) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 113 Cal. Rptr. 2d 399, 415 (Cal. Ct. App. 2001)). The tethering test "require[s] that 'the public policy which is a predicate to [a consumer unfair competition action under the 'unfair' prong of the UCL] must be 'tethered' to specific constitutional,

44

statutory or regulatory provisions.'" *Id.* (second alteration in original) (quoting *Gregory v.*

*Albertson's, Inc.*, 128 Cal. Rptr. 2d 389, 395 (Cal. Ct. App. 2002)).

The California Supreme Court has twice noted, but not yet had occasion to resolve, a split

among California's intermediate appellate courts regarding which test should be used to evaluate

"unfair" conduct under the UCL within the consumer context. *See id.* (noting that some

appellate courts apply balancing test, some tethering test, and some a test under section 5 of the

FTC Act); *see also Capito v. San Jose Healthcare Sys.*, 561 P.3d 380, 386-87 (Cal. 2024)

(noting, four years later, that this split remains "unsettled").[6] But the Ninth Circuit recently

explained, albeit in an antitrust matter, that the UCL's tethering and balancing tests are used to

measure harm to competitors and consumers, respectively:

> First, to support "any finding of unfairness to *competitors*," a court uses the "tethering" test, which asks whether the defendant's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Second, to support a finding of unfairness to *consumers*, a court uses the balancing test, which "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim."

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2025) (first quoting *Cel-Tech*

*Cmmc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999); and then quoting

*Progressive W. Ins. Co. v. Super. Ct.*, 37 Cal. Rptr. 3d 434, 452 (Cal. Ct. App. 2005)); *see also*

*Nationwide Biweekly*, 462 P.3d at 472 n.10 (noting that California courts that apply balancing

test do so to "determin[e] whether a business practice is unfair to consumers").

Here, TechSource concedes that "Defendants are not TechSource's or other content

creators' competitor," Opp. at 29, which seemingly renders the tethering test, as understood by

---

[6] Defendants additionally argue that TechSource's UCL claim also fails under the FTC test, Br. at 29, and Plaintiff does not respond to that argument. The Court views that non-response as a concession, *see, e.g.*, *Piuggi v. Good for You Prods. LLC*, 739 F. Supp. 3d 143, 168 (S.D.N.Y. 2024) (collecting cases), and therefore does not address the FTC test here.

the Ninth Circuit, inapplicable.  Even if the tethering test applies, though, TechSource ties Defendants' conduct only to "California's public policy against interference with another's prospective economic advantage."  *See* Compl. ¶ 236.  The Court has already found that claim insufficiently pleaded under New York law, and the California treatise cited by TechSource demonstrates that the tort is treated the same under California law: it concerns "business relations or advantages that are merely prospective and ordinarily not the subject of an existing contract." 5 Witkin, Summary 11th Torts § 854 (2025).  Accordingly, TechSource does not sufficiently allege that Defendants' conduct is unfair under the UCL's tethering test.

Nor does TechSource allege that it is a consumer, or indeed (as discussed in connection with Plaintiff Young's NYDPA claim, *see supra* Section IV.A) that any consumer has been harmed here.  Plaintiff TechSource further fails to "cite any authority indicating that the balancing test applies in cases where a plaintiff is not a consumer," *Distance Learning Co. v. Maynard*, No. 19-cv-03801, 2020 WL 2995529, at *10 (N.D. Cal. June 4, 2020) (quoting *Almasi v. Equilon Enters., LLC*, No. 10-cv-03458, 2012 WL 3945528, at *9 (N.D. Cal. Sept. 10, 2012)), or that "plaintiffs[] who are neither consumers nor competitors[] can bring a claim under the unfair prong of the UCL," *Mireskandari v. Daily Mail & Gen. Tr. PLC*, No. 12-cv-02943, 2013 WL 12114762, at *32 (C.D. Cal. Oct. 8, 2013).  That is fatal.  *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Centex Homes*, No. 12-0371-SC, 2013 WL 4528956, at *4 (N.D. Cal. Aug. 26, 2013) ("[Plaintiff] cannot state a claim under the [UCL] balancing test because [Plaintiff] is not a consumer.").  Accordingly, TechSource does not sufficiently allege that Defendants' conduct is unfair under the UCL's balancing test.

For all these reasons, even if TechSource sufficiently pleads a lack of adequate remedy at law, or if its UCL claim is properly pleaded in the alternative here, the claim still fails, because

TechSource does not sufficiently plead that Defendants engaged in unlawful or unfair conduct within the meaning of the UCL.  The claim is, therefore, dismissed.

### 3.  Florida Deceptive and Unfair Trade Practices Act

Finally, Count IX of the Complaint asserts a claim, on behalf of Plaintiff Brevard Marketing and the putative Florida subclass, for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.  See* Compl. ¶¶ 258-68.  "To assert a claim under FDUTPA, a plaintiff must allege (1) a deceptive or unfair act in the conduct of trade or commerce; (2) causation; and (3) actual damages."  *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023).  A deceptive act under FDUTPA is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment"; an unfair act is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Point Conversions, LLC v. WPB Hotel Partners, LLC*, 324 So.3d 947, 957 (Fla. Dist. Ct. App. 2021) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003)).  Thus, "while 'the claimant does not have to be a consumer to bring' an FDUTPA claim, 'the claimant [must] prove that there was an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim.'"  *Pictometry Int'l Corp. v. Air Am. Flight Ctr., LLC*, 394 F. Supp. 3d 320, 340 (S.D.N.Y. 2019) (quoting *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164 (Fla. Dist. Ct. App. 2015)).

Brevard Marketing's FDUTPA claim fails for the much same reason as Young's New York deceptive trade practices claim: Brevard Marketing alleges that Defendants have misled the merchants and deprived Brevard Marketing of its rightful commissions, *see* Compl. ¶¶ 262-64, but it does not allege that this conduct resulted in any detriment or injury to consumers.  *See, e.g., CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *1, *5

(11th Cir. July 29, 2022) (affirming dismissal of FDUTPA claim where defendant procured contract from third party that had already contracted with plaintiff for same work, because only alleged harm was plaintiff's "[in]ability to provide its services to" third party, which was an "alleged harm solely to itself [] in its capacity as the construction service provider, and not to the consumer of its services"); *J.G.G. Tobacco Holding Co. v. Antigua Esteli Tobacco, Corp.*, No. 19-23732-Civ, 2020 WL 4926582, at *5 (S.D. Fla. May 20, 2020) (dismissing FDUTPA counterclaim where plaintiff "interfer[ed] with one of [d]efendants' business relationships," but defendants did "not allege how this conduct caused or could cause consumer harm or injury" (quotation mark omitted)); *Classic Soft Trim, Inc. v. Albert*, No. 18-cv-1237-Orl-78GJK, 2020 WL 6734402, at *10 (M.D. Fla. Aug. 13, 2020) (dismissing FDUTPA claim where complaint was "replete with allegations that [defendant]'s conduct harmed Plaintiffs but fail[ed] to allege any harm to consumers").  Therefore, Brevard Marketing fails to state a claim under FDUTPA.

48

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss under Rule 12(b)(1) is DENIED, and its motion to dismiss under Rule 12(b)(6) is GRANTED to the extent that Counts I, II, IV, V, VI, VII, VIII, and IX of the Complaint are dismissed.  Given that Plaintiffs' cursory request for leave to amend, *see* Opp. at 31, does not "specify[] what additional facts, if any, they might assert in a new pleading," this dismissal is with prejudice.  *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011); *accord Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 55 (2d Cir. 2025).  The motion to dismiss is DENIED as to Count III.

Defendants shall answer the Complaint within two weeks of this Order.  The Clerk of Court is respectfully directed to terminate the motion at Dkt. 43.

Dated:  March 25, 2026
        New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge